IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF A CELLULAR PHONE (ITEM 1) LOCATED AT A SECURE LOCATION IN THE LYNCHBURG POLICE DEPARTMENT LABELED UNDER CASE NUMBER 2021-008521.** | **FILED UNDER SEAL**  Case No.   6:21mj25 |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Daniel Bailey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of a certain electronic device, more fully described below and in Attachment A, which is currently in law enforcement possession, and the extraction from this device of electronically stored information described more fully herein and in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) and have been since 2017. I am also a Detective with the Lynchburg Police Department (Virginia) and be been so employed since 2002. I am currently assigned to investigate drug trafficking organizations as a member of the DEA, Washington Field Division/Roanoke Resident Office. My duties as a Task Force Officer involve the investigation of various criminal activities of narcotics traffickers and their associates.  In investigating these matters, I have acted as a case agent, an undercover agent, and a contact agent for confidential sources.  These investigations have resulted in the issuance of federal search warrants, seizure warrants, indictments, and

convictions of persons for federal narcotics violations. During my employment as a law enforcement officer, I have received multiple hours of training in narcotics enforcement and investigative techniques, and I have personally participated in numerous investigations. I have also spoken on numerous occasions with informants, suspects, and other experienced narcotics traffickers concerning the methods and practices of drug traffickers, including the methods and practices used by traffickers of methamphetamine, heroin, and cocaine. I have been involved in the execution of numerous search warrants on electronic devices, including cellphones, and in obtaining location information for those devices.

3. Based on my training and experience investigating narcotics and the distribution of narcotics, I know that it is common for individuals engaged in this activity to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities. I know that "smart" phones play an integral role in the daily lives of individuals engaging in narcotics trafficking and that these individuals use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging, instant messaging, and telephone conversations. I also know that it is common for narcotics trafficker to use multiple "smart" phones to communicate with co-conspirators in order to compartmentalize their illegal activity and avoid detection by law enforcement. Further, I know it is common for narcotics traffickers to change their phones and phone numbers in order to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is as follows:

   a. iPhone with green/grey case marked as Item 1 of Lynchburg Police case number 2021-008521 ("**Target Cell Phone**").

## STATEMENT OF PROBABLE CAUSE

6. The United States, including the DEA and the Lynchburg Police Department, is conducting a criminal investigation of Co-conspirator #1 ("CC-1") and others regarding violations of distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and conspiracy to distribute cocaine and marijuana in violation of 21 U.S.C. § 846.

7. The United States, including Drug Enforcement Administration ("DEA") and the Lynchburg Police Department ("LPD"), is conducting a criminal investigation of Co-Conspirator #1, Jabari JOHNSON ("JOHNSON"), and others regarding violations of distribution and possession with intent to distribute cocaine and other controlled substances, in violation of 21 U.S.C. § 841(a)(1), and conspiracy to distribute cocaine and other controlled substances, in violation of 21 U.S.C. § 846.

8. CC-1 has been identified as the leader of a Drug Trafficking Organization. Based on this investigation, CC-1 is reported to supply multiple co-conspirators, in addition to others in the Lynchburg area, with distributable amounts of cocaine HCL and marijuana.

9. JOHNSON has been identified as a criminal associate of CC-1.

10. JOHNSON was indicated by a federal grand jury for conspiracy to distribute controlled substances (Case Number 6:21-CR-1). The **Target Cell Phone** was recovered during JOHNSON's arrest on June 29, 2021. Those details will be further described in this affidavit.

3

**Identification of the Target Cell Phone**

11. On January 26, 2021, CC-1 was arrested on a warrant issued from the Western District of Virginia based on a criminal complaint charging him with conspiracy to distribute controlled substances (6:21-mj-5). Law enforcement had obtained federal search warrants in the Western District of North Carolina (Western District of North Carolina Case Number 3:21-mj-15) for evidence related to the drug trafficking conspiracy at the home of CC-1 and of co-conspirator #2 ("CC-2").

12. During the search of CC-1's home, law enforcement found a large amount of United States currency, multiple firearms, digital scales, and several cellular phones.

13. Law enforcement subsequently searched one of the cellular phones, pursuant to the federal search warrant issued in the Western District of North Carolina. This phone was determined to use the number 718-314-0442.

14. Law enforcement analyzed the communications in this phone and found messages with a number saved in the phone as "Jabari." That phone number was the **Target Cell Phone**.

15. Based on the data available at the time of this affidavit, communications between CC-1 and the **Target Cell Phone** were exchanged between October 2020 and December 2020.

16. A portion of the text communications between CC-1 and the **Target Cell Phone**, located on the phone of CC-1, included language indicative of narcotic distribution. Those communications included, but were not limited to, JOHNSON advising "They got 45." CC-1 responded, "I'll give them 32 joints fire". JOHNSON advised in one message that "I'm goin over 2 count tha money," JOHNSON advised in a message, "Anything around mite got a whole joint gone." JOHNSON sent photographs of what appeared to be marijuana to CC-1. CC-1 sent a photograph of what appeared to be crystal methamphetamine to JOHNSON. JOHNSON replied,

"Need that." This affiant knows the term "joint" to be used by distributors to describe ounces and kilograms of controlled substances. These messages demonstrate that JOHNSON used the **Target Cell Phone** to communicate about the distribution of controlled substances.

17. In March of 2021, Co-conspirator #3 ("CC-3") was arrested on a warrant issued from the Western District of Virginia based on a criminal complaint charging him with conspiracy to distribute controlled substances. Law enforcement had obtained federal search warrants in the Western District of Virginia for evidence related to the drug trafficking conspiracy at the home of CC-3.

18. During the search of CC-3's home, law enforcement found several cellular phones. Law enforcement subsequently searched one of the cellular phones, pursuant to the federal search warrant issued in the Western District of Virginia.

19. Law enforcement analyzed the communications in this phone and found messages with a number saved in the phone as "Bari." That phone number was the **Target Cell Phone**. CC-3 advised law enforcement that **Target Cell Phone** was being used by JOHNSON.

20. A portion of the text communications between CC-3 and the **Target Cell Phone**, located on the phone of CC-3, included language indicative of narcotic distribution. CC-3 sent a message to JOHNSON stating, "It's 15 a joint now straight raw tho it'll go down soon I just need 15 real quick". JOHNSON sent a message to CC-3 asking, "How muc 4 that half of joint". JOHNSON sent a message "in that kitchen tryna get this shit 2 locc brah". CC-3 advised that statement meant JOHNSON was cooking powder cocaine into crack cocaine. These messages demonstrate that JOHNSON used the **Target Cell Phone** to communicate about the distribution of controlled substances.

21. In June of 2021, this affiant served an Administrative Subpoena on VERIZON WIRELESS for subscriber information on the **Target Cell Phone**. This affiant later received the requested data of that subpoena and determined that "Jabari JOHNSON" was the subscriber of the **Target Cell Phone**. This affiant determined that as of June 22, 2021 the **Target Cell Phone** was still an active number.

### Recovery of the Target Cell Phone

22. On June 29, 2021, members of the United States Marshal Service and the Lynchburg Police Department arrested JOHNSON on a federal arrest warrant in Lynchburg, Virginia within the Western District of Virginia. That arrest warrant was pursuant to an indictment charging JOHNSON with conspiracy to distribute controlled substances in the Western District of Virginia. Subsequent to JOHNSON's arrest, the **Target Cell Phone** was seized from JOHNSON's front right pant pocket. The **Target Cell Phone** was then placed in a secure location at the Lynchburg Police Department, stored as Item 1 of case number 2021-008521.

23. On June 29, 2021, this affiant called the cellular phone number believed to have been used by JOHNSON and that was in contact with CC-1 and CC-3 while holding the **Target Cell Phone**. The **Target Cell Phone** began to ring and showed this affiant's phone number on the caller ID screen.

24. I know from training and experience that drug distributors often use cellular phones to arrange drug deals by using the calling feature, text message feature, or a communication-based application and as set forth above, and as explained above law enforcement has specific information that JOHNSON used a telephone to conduct drug deals. An analysis of call patterns can identify other drug dealers. Photographs or videos found on

cellular telephones often show contraband, or locations where contraband may be found. Contact numbers stored in cellular telephone(s) may identify other drug distributors or associates. I know from training and experience that persons who distribute illegal narcotics often use multiple phones to hide evidence of their crimes from law enforcement and often subscribe them in fictitious names. And here, examining further identifiers on the phones could prove JOHNSON's identity as a source of supply. All told, significant evidence of criminal activity can be found within cellular telephones found in the possession of a drug dealer.

## TECHNICAL TERMS

25. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. *Wireless telephone:* A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

   b. *Digital camera:* A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player:* A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS:* A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA:* A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *Tablet:* A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save

      data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. *Pager:* A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. *IP Address:* An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. *Internet:* The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, I know that the devices described in Attachment A have capabilities that allow them to serve as a wireless telephone, phone book, digital camera, digital recorder, GPS Navigation, portable media player, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it contains evidence described by the warrant.

30. *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A, in order to seek the items described in Attachment B.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

Respectfully submitted,

        *s/Daniel Bailey*
        Daniel Bailey, Task Force Officer

Drug Enforcement Administration

Received by reliable electronic means and sworn and attested to by telephone on this <u>12th</u> day of July 2021.

*Robert S. Ballou*
ROBERT S. BALLOU
UNITED STATES MAGISTRATE JUDGE